ANTHONY M. BARNES, SBN 199048
Email: amb@atalawgroup.com
JASON R. FLANDERS, SBN 238007
Email: jrf@atalawgroup.com
AQUA TERRA AERIS (ATA) LAW GROUP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Telephone: (917) 371-8293

*Attorney for Plaintiff*
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>             Plaintiff,<br><br>      vs.<br><br>BRAGG INVESTMENT COMPANY, INC., doing business as BRAGG CRANE SERVICE, a California corporation,<br><br>             Defendant. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

California Sportfishing Protection Alliance ("CSPA" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.        JURISDICTION AND VENUE

1.        This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.        On October 16, 2020, CSPA issued a 60-day notice letter ("Notice Letter") to Bragg Investment Company, Inc. ("Defendant" or "Bragg"), for the industrial facility under its control in Richmond, California. The Notice Letter informed Defendant of its violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No*. 2014-0057-DWQ and amended by Order No. 2015-0122 –DWQ and amended by o Order No. 2015-0122-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("Strom Water Permit"), and the Clean Water Act at the Bragg facility in Contra Costa County located at 457 Parr Boulevard, Richmond, CA 94801 with Waste Discharger Identification Number (WDID) 2 07I002181 ("Facility").

3.        The Notice Letter informed Defendant of CSPA's intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

4.        The Notice Letter was sent to Defendant's Chief Executive Officer and Agent for Service of Process, Marshall Scott Bragg; (40 C.F.R. § 135.2(a)(2)). The Notice Letter was also sent to the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, San Francisco Region, ("Regional Board") as required by Section 505(b) of the CWA, 33

1   U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as **Exhibit A** and is fully incorporated

2   herein by reference.

3          5.     More than sixty (60) days have passed since the Notice Letter was served on the

4   Defendant and the State and Federal agencies. CSPA is informed and believes, and thereon alleges,

5   that neither the EPA nor the State of California has commenced or is diligently prosecuting an

6   action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. §

7   1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of

8   the CWA, 33 U.S.C. § 1319(g).

9          6.     Venue is proper in the Northern District of California pursuant to Section 505(c)(1)

10  of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this

11  judicial district.

12  **II.     INTRODUCTION**

13         7.     With every rainfall event, hundreds of millions of gallons of polluted rainwater,

14  originating from industrial operations such as the Facility referenced herein, pour into the storm

15  drains and local waterways. The consensus among regulatory agencies and water quality specialists

16  is that storm water pollution accounts for more than half of the total pollution entering marine and

17  river environments each year. These surface waters, known as Receiving Waters, are ecologically

18  sensitive areas. Although pollution and habitat destruction have drastically diminished once

19  abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird

20  species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water

21  contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel,

22  and zinc, as well as, high concentrations of nitrate and nitrite, and other pollutants. Exposure to

23  polluted storm water harms the special aesthetic and recreational significance that the surface waters

24  have for people in the surrounding communities. The public's use of the surface waters exposes

25  many people to toxic metals and other contaminants in storm water and non-storm water discharges.

26  Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired

27  by polluted discharges to the Receiving Waters.

28

8.      High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

9.      Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic and the solubility of a substance varies as a function of the pH of a solution. A one-whole-unit change in SU represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

10.     This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendant's operations at the Facility.[1]

11.     CSPA specifically alleges violations regarding Defendant's discharge of pollutants from the Facility into waters of the United States; violations of the filing, monitoring and reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

## III.   PARTIES

### A.   California Sportfishing Protection Alliance

12.     CSPA is a California non-profit 501(c)(3) public benefit conservation and research organization with its principal place of business in Stockton, California. CSPA's organizational

---

[1] The Facility are fully described in Section V below.

1    purpose is the protection, preservation, and enhancement of fisheries and associated aquatic and

2    riparian ecosystems of California's waterways, including San Pablo Bay and the San Francisco Bay,

3    the potential Receiving Waters herein. This mission is implemented through active participation in

4    water rights and water quality processes, education and organization of the fishing community,

5    restoration efforts, and vigorous enforcement of environmental laws enacted to protect fisheries,

6    habitat and water quality. Members of CSPA use and enjoy California's numerous rivers, creeks

7    and waterways, including San Pablo Bay for recreational and scientific activities such as viewing

8    and enjoying wildlife, boating, fishing, birdwatching, golfing, engaging in scientific study to expand

9    their understanding of various species and habitat health. CSPA's members derive significant and

10   ongoing use and enjoyment from the aesthetic, recreational, and conservation benefits of the waters

11   described above. CSPA has hundreds of members who live and/or recreate in and around Contra

12   Costa County. CSPA is dedicated to the preservation, protection, and defense of the environment,

13   wildlife, and natural resources of local surface waters. To further these goals, CSPA actively seeks

14   federal and state agency implementation of the Clean Water Act and, where necessary, directly

15   initiates enforcement actions on behalf of itself and others.

16        13.    CSPA has approximately 2,000 members who live, recreate and work in and around

17   waters of the State of California, including San Pablo Bay and the San Francisco Bay. CSPA is

18   dedicated to the preservation, protection, and defense of the environment, and the wildlife and the

19   natural resources of all waters of California. To further these goals, CSPA actively seeks federal and

20   state agency implementation of the Clean Water Act and other laws and, where necessary, directly

21   initiates citizen enforcement. As referenced in above, members of CSPA use and enjoy the

22   Receiving Waters herein into which Defendant has caused, is causing, and will continue to cause,

23   pollutants to be discharged. Defendant's discharges of pollutants threaten or impair each of those

24   uses or contribute to such threats and impairments. Thus, the interests of CSPA's members have

25   been, are being, and will continue to be adversely affected by Defendant's ongoing failure to

26   comply with the Clean Water Act and/or the Storm Water Permit. The relief sought herein will

27   redress the harms to Plaintiff caused by Defendant's activities.

28        14.    Defendant's failure to comply with the procedural and substantive requirements of

the Storm Water Permit and/or the Clean Water Act, including but not limited to Defendant's discharge of polluted stormwater and non-stormwater from the Facility, negatively impacts and impairs CSPA's members' use and enjoyment of these waters.

15.    Continuing commission of the acts and omissions alleged herein will irreparably harm CSPA's members, for which harm they have no plain, speedy, or adequate remedy at law.

**B.    The Owner and/or Operator of the Bragg Facility**

16.    CSPA is informed and believes, and thereon alleges, that Bragg maintains its headquarters at 6251 Paramount Blvd., Long Beach, CA 90805.

17.    CSPA is informed and believes, and thereon alleges, that Defendant is the owner of the Facility in Richmond.

18.    CSPA is informed and believes, and thereon alleges, that Defendant is the operator of the Facility.

19.    CSPA refers to Defendant and its management herein as the "Owners/Operators" of the Facility.

20.    CSPA is informed and believes, and thereon alleges, that Defendant is an active corporation registered in California.

21.    CSPA is informed and believes, and thereon alleges, that the name and address of the Registered Agent for Bragg, Inc. is Marshall Scott Bragg, 6242 Paramount Blvd., Long Beach, CA 90805.

**IV.    STATUTORY BACKGROUND**

**A.    The Clean Water Act**

22.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

23.    Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with

approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342.

24. Section 301(b) of the Clean Water Act requires that, by March 31, 1989, all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

25. The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

26. The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

27. The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

28. The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

29. "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7).

30. "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

31. The EPA promulgated regulations for the Section 402 NPDES permit program defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the

United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.

32.     The Clean Water Act confers jurisdiction over non-navigable waters that are tributaries to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

33.     A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

34.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

35.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

36.     The Defendants are "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

37.     An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

38.     Pursuant to sections 309(d) and 505 of the Clean Water Act, each separate violation of the CWA $37,500 per day per violation for all Clean Water Act violations after January 12, 2009 and $55,800.00 per day per violation for violations that occurred after November 2, 2015. *See* 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

39.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or

1 substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees,

2 and consultants' fees.

3       **B.**    **California's Storm Water Permit**

4      40.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its

5 own EPA-approved NPDES permit program for regulating the discharge of pollutants, including

6 discharges of polluted storm water. States with approved NPDES permit programs are authorized

7 by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits

8 issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable

9 to all industrial storm water dischargers. *See id.*

10      41.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the

11 EPA has authorized California to issue NPDES permits, including general NPDES permits.

12 California has designated the State Board and the Regional Water Quality Control Boards to

13 administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*,

14 135 Cal. App. 4th 1377, 1380-81 (2006). In California, the State Board is charged with regulating

15 pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

16      42.     The Storm Water Permit is a statewide general NPDES permit issued by the State

17 Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25.

18 Violations of the Storm Water Permit are also violations of the CWA. Storm Water Permit, Section

19 XXI(A).

20      43.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality

21 Standards, including water quality objectives and beneficial uses for navigable waters of the United

22 States. The CWA prohibits discharges from causing or contributing to a violation of such state

23 Water Quality Standards. *See* 33 U.S.C. § 1313(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §§

24 122.44(D)(1).

25      44.     The State Board elected to issue a statewide general permit for industrial discharges.

26 The State Board issued the Storm Water Permit on or about November 19, 1991, modified the

27 Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or

28 about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

45.     On July 1, 2015, the current Storm Water Permit became effective and was issued as NPDES General Permit No. CAS000001 Order No. 2014-0057-DWQ. Storm Water Permit, Section I(A) (Finding 4).

46.     On November 6, 2018, the State Board amended the Storm Water Permit with Order No. No. 2015-0122 –DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit Amendment").

47.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. Storm Water Permit, Section I(A) (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. Storm Water Permit, Section I(A) (Finding 17), Section II(B).

48.     Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i), 1365(f).

**C.     The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

49.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. Storm Water Permit, Discharge Prohibition III(B).

50.     Effluent Limitation V(A) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for

conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), TSS, oil and grease ("O&G"), pH, and fecal coliform.

51.     Discharge Prohibition III(C) of the Storm Water Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

52.     Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b). Storm Water Permit, Effluent Limitation V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008; Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

53.     The EPA established Parameter Benchmark Values for the following parameters, among others, are as follows: total suspended solids ("TSS")—100 mg/L; oil & grease ("O&G")—15 mg/l; iron ("Fe")—1 mg/l; copper ("Cu")—.0123 mg/l; zinc ("Zn")—.11 mg/L; and pH—6-9 s.u. The Basin Plan's Water Quality Standards for the Los Angeles Region requires a narrower pH range of 6.5—8.5 pH units. The Storm Water Permit contains Numeric Action Levels ("NALs") for these same parameters that generally mirror the Benchmark Values.

54.     The Storm Water Permit includes NALs. Storm Water Permit, Section I(M) (Finding 62). During the public commenting period, the State Board stated that "NALs are not designed or intended to function as numeric technology-based effluent limitations." State Board 2012 Draft Industrial General Permit Response to Comments, Response #6 to Comment #12; *see also* Storm Water Permit Section I(M) (Finding 63).

55.     Receiving Water Limitation VI(B) of the Storm Water Permit prohibit storm water discharges from adversely impacting human health or the environment.

56.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation.

57.     Receiving Water Limitation VI(A) of the Storm Water Permit prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

58.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

59.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

60.     The State Water Quality Control Board, San Francisco Region, has issued the Water Quality Control Plan for the for the San Francisco Bay Basin ("Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan states the "All waters shall be maintained free of toxic substances in concentrations which are toxic to, or which produce detrimental physiological responses in, human, plant, animal, or aquatic life." Basin Plan, 3.3.1. The Basin Plan sets forth water quality objectives for metals such as copper, zinc, lead, nickel, and mercury. Basin Plan, Table 3-3. The Basin Plan decrees that waters shall not contain chemical constituents, discoloration, substances or floating material in concentrations that cause nuisance or adversely affect beneficial uses *Id*. at 3.1.

61.     The Basin Plan specifies existing beneficial uses for the Receiving Waters, including contact and non-contact recreation, commercial and sportfishing, cold and warm fresh water habitat, wildlife habitat, rare, threatened, or endangered species habitat, migration of aquatic organisms, and spawning, reproduction and/or early development. Basin Plan, Table 2-1

62.     The Water Quality Control Plan for the San Francisco Bay Basins also sets forth water quality standards and prohibitions applicable to Bragg's storm water discharges. The Basin

Plan identifies existing and potential Beneficial Uses for water bodies in the San Francisco Bay Basin, which includes the San Pablo Bay and the San Francisco Bay, such as contact and non-contact water recreation, wildlife habitat, navigation, migration, estuarian habitat, spawning, and shellfish harvesting (Basin Plan, Table 2-1.)

63. Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act.

64. Pursuant to Clean Water Act Section 303(d) list of impaired waterbodies, the San Francisco Bay is impaired for chlordane, DDT, dieldrin, mercury, PCBs, selenium, dioxin compounds, furan compounds, and trash. San Pablo Bay is impaired for chlordane, dieldrin, PCBs, selenium, mercury, DDT, dioxin-like PCBs, dioxin compounds, and furan compounds.

65. In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

66. The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as 0.067 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[2]

67. The CTR includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.

68. Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitations and Section VI(A) of the Storm Water Permit.

---

[2] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit required permittees to report their sample results as total metal concentrations. *See* Storm Water Permit, Attachment H at 18.

**D.     The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

69.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. Storm Water Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. Storm Water Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. Storm Water Permit, Section I(D) (Finding 32), Section X(C).

70.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. Storm Water Permit, Section X.

71.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to

reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section X.

72. The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. Storm Water Permit, Section X(A)-(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. Storm Water Permit, Section X(B) and Section XV.

73. The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. Storm Water Permit, Sections I(J) (Finding 55), X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via SMARTS within 30 days. Storm Water Permit, Section X(B)(2). Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. *Id.* at Section X(B)(3); Storm Water Permit, Fact Sheet, Section II (I)(1).

**E.    The Storm Water Permit's Monitoring and Reporting Requirements**

74. The Storm Water Permit requires facility operators to develop and implement a Monitoring Implementation Plan ("MIP"). Storm Water Permit Sections X(I) and XI(A)-XI(D). The MIP must ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Storm Water Permit. Storm Water Permit Section XI. The MIP must ensure that practices at the facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

75. Further objectives of the MIP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm

1  water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent

2  Limitations, and Receiving Water Limitations. Storm Water Permit, Section XI.

3      76.    The MIP aids in the implementation and revision of the SWPPP and measures the

4  effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. *Id*.

5      77.    The Storm Water Permit requires facility operators to monitor and sample storm

6  water discharges to ensure that the facility is complying with the terms of the permit. Storm Water

7  Permit, Sections I(J) (Findings 55-56) and XI.

8      78.    Section XI(A)(4) of the Storm Water Permit require that the MIP shall be revised as

9  necessary to ensure compliance with the Storm Water Permit.

10      79.    Section XI(A) of the Storm Water Permit require dischargers to conduct monthly

11  visual observations of storm water discharges.

12      80.    Section XI(A)(2) of the Storm Water Permit requires dischargers to document the

13  presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the

14  discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers

15  are required to maintain records of observations, observation dates, discharge locations observed,

16  and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See*

17  Storm Water Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise

18  the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants

19  at the facility. Storm Water Permit, Section X(B)(1).

20      81.    The Storm Water Permit requires dischargers to visually observe and collect samples

21  of storm water discharges from all locations where storm water is discharged. Storm Water Permit

22  Section XI(B)(4).

23      82.    Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation

24  event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48)

25  hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

26      83.    Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and

27  analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1

28

1   to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June

2   30).

3       84.   Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm

4   water samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-

5   specific basis that serve as indicators of the presence of all industrial pollutants identified in the

6   pollutant source assessment, additional applicable industrial parameters related to receiving waters

7   with 303(d) listed impairments or approved TMDLs, and additional parameters required by the

8   Regional Water Board.

9       85.   Section XVI of the Storm Water Permit requires dischargers to submit an annual

10   report with a Compliance Checklist that indicates whether a Discharger complies with, and has

11   addressed all applicable requirements of the Storm Water Permit, an explanation for any non-

12   compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an

13   identification, including page numbers and/or Sections, of all revisions made to the SWPPP within

14   the reporting year, and the date(s) of the Annual Evaluation.

15       86.   Section XI(B)(2) of the Storm Water Permit requires a discharger to collect and

16   analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1

17   to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June

18   30). Dischargers are required to submit the storm water sample analyses to the State Board and

19   Regional Board.

20       87.   Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm

21   water samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-

22   specific basis that serve as indicators of the presence of all industrial pollutants identified in the

23   pollutant source assessment, additional applicable industrial parameters related to receiving waters

24   with 303(d) listed impairments or approved TMDLs, and additional parameters required by the

25   Regional Board.

26       88.   Section XVI of the Storm Water Permit requires a discharger to certify and submit

27   via SMARTS an Annual Report no later than July 15th following each reporting year using the

28   standardized format and checklists in SMARTS and include: 1) a compliance checklist that

1  indicates whether a discharger complies with, and has addressed all applicable requirements of this

2  General Permit; 2) an explanation for any non-compliance of requirements within the reporting

3  year, as indicated in the compliance checklist; and an identification, including page numbers and/or

4  sections, of all revisions made to the SWPPP within the reporting year.

5          89.     Section XII(C) of the Storm Water Permit requires a discharger to execute a Level 1

6  Exceedance Response Actions ("ERA") Evaluation and prepare a Level 1 ERA Report should they

7  exceed a Numeric Action Level ("NAL") for any required sampling and analysis parameter under

8  the Storm Water Permit, or  the Storm Water Permit requires a Level 2 ERA and the preparation of

9  a Level 2 ERA Report should they exceed a NAL for two consecutive reporting years, for any

10  required sampling and analysis parameter under the Storm Water Permit. The ERA Evaluation

11  should identify additional BMPs and SWPPP revisions needed to prevent future NAL exceedances

12  and comply with the Storm Water Permit. Based upon the ERA Evaluation(s), the discharger shall

13  as soon as practicable, but not later than January 1, submit an ERA Report and certify that the ERA

14  Report includes: 1) a summary of the ERA Evaluation, 2) a detailed description of the SWPPP

15  revisions and any additional BMPs for each parameter that exceeded a NAL. Level 2 ERA reports

16  require more stringent requirements than a Level 1 ERA report.

17  **V.      STATEMENT OF FACTS**

18      **A.     Bragg, Investment Company, Inc. Facility Site Description**

19          90.     Defendant owns and operates an industrial facility located at 457 Parr Blvd.,

20  Richmond, CA 94801 that engages in all activities required to maintain mobile cranes and rigging

21  equipment to provide crane and other construction equipment services throughout the northern

22  California. Specifically, industrial activities at the Facility include equipment and vehicle.

23          91.     Facility's NOI states that the site encompasses approximately 8 acres, which is

24  mostly exposed to storm water and operates Monday through Friday from 7:00 am to 5:00 pm.

25          92.     In addition to the minimum parameters required for sampling under the Storm Water

26  Permit, Bragg also samples for an industry-related parameter, Fe. Beyond the required sampling

27  parameters Facilities must also sample and analyze for additional parameters identified on a facility-

28  specific basis to reflect a facilities' pollutant source assessment, as required by the Storm Water

1  Permit and the Regional Board, and additional parameters related to receiving waters with 303(d)

2  listed impairments. Storm Water Permit, Section XI.B.6.

3      93.      CSPA is informed and believes, and thereon alleges, industrial activities occur

4  throughout the Facility. Truck-mounted mobile cranes, fleet trucks, trailers, rigging and crane

5  equipment and components, scaffolding, steel cables and support vehicles, are stored outdoors at the

6  Facility; outdoor maintenance of rigging and crane equipment are also included among the

7  industrial activities that occur outdoors at the Facility. These industrial activities create and release

8  dust, debris, metals, and other pollutants that are discharged with storm water flows to the

9  Receiving Waters.

10     94.      CSPA is informed and believes, and thereon alleges that pollutant sources

11 contributing to storm water contamination at the Facility include, but are not limited to: diesel fuel,

12 and oil and grease from fuel and lubricant leaks and spills, dust, dirt, and metallic sediment from

13 maintaining, storing, moving and employment of industrial equipment and vehicles on site; and

14 metallic dusts and debris, oil and grease from industrial activities at the Facility.

15     95.      According to the Facility's December 2018 ERA Level 1 Report the Facility is

16 divided into two drainage areas down from the four drainage areas identified in the Facility SWPPP:

17 1) the southern-most area which includes a parking area and building roof drainage and is identified

18 as Drainage Area 1; and 2) the remainder of the central, north and northeastern areas of the Facility,

19 identified as Drainage Area 2.

20     **B.      San Pablo Bay and the San Francisco Bay**

21     96.      San Pablo Bay is a tidal estuary that forms the northern extension of San Francisco

22 Bay in the East Bay and North Bay regions of the San Francisco Bay Area. San Pablo Bay is a

23 primary wintering stop for the canvasback duck population on the Pacific Flyway, and a migratory

24 staging ground for numerous species of waterfowl. Much of the northern shore of San Pablo Bay is

25 protected as part of the San Pablo Bay National Wildlife Refuge. Endangered species that are found

26 in San Pablo Bay include the California brown pelican, California clapper rail, and salt marsh

27 harvest mouse. The San Francisco Bay is one of California's most important ecological habitats:

28 Dungeness crab, California halibut, and Pacific salmon fisheries rely on the San Francisco Bay as a

1 nursery.

2   **C.**  **The Facility Storm Water Permit Coverage**

3   97.  The NOI for the Facility lists the Receiving Water as the San Pablo Bay.

4   98.  Via search of the SMARTS database, CSPA obtained a SWPPP for the Facility dated

5 December 21, 2015 ("Facility SWPPP").

6   99.  CSPA is informed and believes, and thereon alleges, that the Facility SWPPP fails to

7 describe and/or adequately describe all of the industrial activities and significant materials at the

8 Facility.

9   100.  CSPA is informed and believes, and thereon alleges, that Facility

10 Owners/Operators have failed to evaluate pollutants and their sources on site and implement BMPs

11 that achieve compliance with Storm Water Permit or the CWA.

12   101.  CSPA is informed and believes, and thereon alleges, that pollutants associated with

13 the Facility include, but are not limited to: pH, TSS, O&G, Zn, Cu, and Fe.

14   102.  CSPA is informed and believes, and thereon alleges, that without properly

15 identifying all industrial activities or all significant materials at Facility in the SWPPP, the

16 Owners/Operators have not developed and/or implemented all appropriate BMPs.

17   103.  CSPA is informed and believes, and thereon alleges, that the Facility SWPPP failed

18 to implement the minimum BMPs required by the General Permit, including: sufficient good

19 housekeeping requirements; preventive maintenance requirements; aerial deposition control;

20 material handling and waste management requirements; employee training and quality assurance;

21 and record keeping.

22   104.  CSPA is informed and believes, and thereon alleges, that Bragg has further failed to

23 implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm

24 water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs;

25 containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs

26 necessary to comply with the General Permit's effluent limitations. Storm Water Permit, Sections

27 X.H.2.

28   105.  CSPA is informed and believes, and thereon alleges, that there are minimal BMPs

implemented or planned for implementation, pursuant to the Facility SWPPP and the single

Exceedance Response Actions ("ERA") report.

106.    CSPA is informed and believes, and thereon alleges, that Defendant has failed to

collect sufficient storm water samples for analyses, in violation of the Storm Water Permit, since at

least October 16, 2015.

107.    CSPA is informed and believes, and thereon alleges, that violations of pH, TSS,

O&G, and Fe occur each time storm water or non-storm water discharges from Facility in violation

of the Storm Water Permit Discharge Prohibitions III.C and III.D, Receiving Water Limitations

VI.A, VI.B.

108.    CSPA is informed and believes, and thereon alleges, that the repeated and significant

exceedances of Benchmark Levels demonstrate that the Owners/Operators have failed and continue

to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and

to prevent discharges of polluted storm water and non-storm water from the Facility.

109.    CSPA is informed and believes, and thereon alleges, that the Owners/Operators have

failed and continue to fail to evaluate the effectiveness of its BMPs and adequately revise the

Facility SWPPP, despite repeated and significant concentrations of pollutants in Facility's storm

water discharges. Further, Defendant has failed to make changes to the Facility's training programs,

or make any other changes based upon events that would signal a need for required revisions or

alteration of practices.

110.    CSPA is informed and believes, and thereon alleges, that pollutants, including but

not limited to those referenced herein, have been and continue to be tracked throughout the

Facility's operation areas.

111.    CSPA is informed and believes, and thereon alleges, that the Owners'/Operators'

failure to properly address pollutant sources and pollutants results in the exposure of pollutants

associated with its industrial activities to precipitation, and that this results in discharges of polluted

storm water from Facility and into local waterways in violation of the Storm Water Permit and/or

the CWA.

112.    CSPA is informed and believes, and thereon alleges, that the Owners'/Operators'

failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows from Facility into the Receiving Waters.

### D.    Storm Water Discharges from the Facility

113.    As detailed in the December 21, 2015 Facility SWPPP, the Facility has a total of four (4) discharge points which drain two (2) drainage areas (as more fully described in **Exhibit A)** that flow into San Pablo Bay.

114.    The four storm water discharge points at the Facility are as follows: 1) two storm drain inlets in the southern portion of the Facility; 2) two storm drain inlets in the central section, one to the east and the other to the north; 3) the central-west boundary of the site via surface flow; and 4) surface/sheet flow onto Goodrick Avenue at the western boundary of the Facility. Storm water from each of these discharge points flows into San Pablo Bay.

115.    Publicly available materials also note that storm water run-on from Parr Boulevard enters the Facility along the southern border where it is discharge via three storm drain inlets to a drainage ditch in the southwest corner of the property; the run-on is not sampled as it is thought this storm water does not enter any industrial areas at the Facility.

116.    The two sampling points at the Facility are identified in the Facility ERA Level 1 Report as Parr and Goodrick. The Parr sampling point is to the south of the railroad spur line near the eastern edge of the Facility; the Goodrick sampling point is in the center of the northern border of the Facility.

### E.   The Facility' Storm Water Discharges to the Receiving Waters Contain Elevated Levels of Pollutants

117.    CSPA is informed and believes, and thereon alleges, that pollutants from the Facility discharge into San Pablo Bay part of the greater San Francisco Bay.

118.    The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters

including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

119. CSPA is informed and believes, and thereon alleges, that San Pablo Bay and the San Francisco Bay are waters of the United States, and/or a tributary to a traditionally navigable water.

120. CSPA is informed and believes, and thereon alleges, that polluted storm water and non-storm water discharges from the Facility to the Receiving Waters.

121. Storm water discharges containing pollutants, including but not limited to, heavy metals such as Zn, Fe, and Cu adversely affect the aquatic environment.

122. Samples of storm water discharges collected at the Facility contain pollutants including TSS, pH, and Fe in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, Benchmarks, and the CTR in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

123. CSPA is informed and believes, and thereon alleges, that during and/or after every significant rain event[3] or any other storm water or non-storm water discharge that has occurred at the Facility since October 16, 2015, through the present, Defendant has discharged and continues to discharge storm water and non-storm water from the Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the Federal Effluent Limitations, the Benchmarks, CTR, and the WQS.

**F.   Defendant's Failure to Comply with the Storm Water Permit's Sampling, Reporting, and Monitoring Requirements**

124. CSPA is informed and believes, and thereon alleges, that Defendant failed and continues to fail to develop an adequate Monitoring Implementation Plan ("MIP") for industrial operations at the Facility that complies with Section XI of the Storm Water Permit.

125. CSPA is informed and believes, and thereon alleges, that Defendant failed and continues to fail to revise the MIP for the Facility as necessary to ensure compliance with Section

---

[3] A significant rain event is an event that produces stormwater runoff, which according to EPA occurs with more than 0.1 inches of precipitation.

XI of the Storm Water Permit.

126.     CSPA is informed and believes, and thereon alleges, that Defendant failed and continues to fail to collect or analyze sufficient storm water samples at the Facility, in violation of Section XI of the Storm Water Permit.

127.     CSPA is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to sample storm water discharges from all discharge locations, in violation of Sections XI(B) and XI(C) of the Storm Water Permit.

128.     In the 2015-2016 reporting year, only three (3) rain events were sampled; in the 2016-2017 reporting only two (2) rain events were sampled, one in the first half of the reporting year and one if the second half of the reporting year; in the following years, a consistent pattern emerged with the Owners/Operators only sampling two rain events per reporting year, both in the second half of the reporting year.

129.     CSPA is informed and believes, and thereon alleges, that Defendant failed and continues to fail to adequately revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Sections XI(B) and XI(C) of the Storm Water Permit.

130.     CSPA is informed and believes, and thereon alleges, that the Owners/Operators of the Facility consistently fail to perform visual observations of storm water during QSEs.

131.     CSPA is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted.

132.     CSPA is informed and believes, and thereon alleges, that the Owners/Operators did not report their non-compliance as required by the Storm Water Permit.

133.     CSPA is informed and believes, and thereon alleges, that the Owners/Operators of the Facility fail to collect sufficient storm water samples during QSEs.

134.     Information available to CSPA also suggests that the BMPs proffered as implemented in the Facility SWPPP are insufficient and ineffective in reducing pollutants to levels compliant with the Storm Water Permit and/or the CWA.

135.     CSPA is informed and believes, and thereon alleges, that Defendant has failed to

submit complete Annual Reports to the Regional Board for the past five reporting years in violation of Section XVI of the Storm Water Permit.

**VI.    CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**Discharges of Contaminated Storm water in Violation of**
**the Storm Water Permit's Effluent Limitations and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

136.    CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

137.    CSPA is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

138.    CSPA is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. *See* Storm Water Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

139.    The Owners/Operators violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

140.    CSPA is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Effluent Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

141.    Each day since at least October 16, 2015 that the Owners/Operators discharge storm water containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

142.    By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from

1   October 16, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§

2   1319(d), 1365, and 40 C.F.R. § 19.4.

3        143.    An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. §

4   1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm

5   Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm CSPA has

6   no plain, speedy, or adequate remedy at law.

7        144.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an

8   actual controversy exists as to the rights and other legal relations of the Parties.

9        WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

10                              **SECOND CAUSE OF ACTION**
          **Defendant's Discharges of Contaminated Storm water in Violation of**
11     **the Storm Water Permit's Receiving Water Limitations and the Clean Water Act.**
                    **33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**
12

13       145.    CSPA incorporates the allegations contained in the above paragraphs as though fully

14   set forth herein.

15       146.    CSPA is informed and believes, and thereon alleges, that discharges of storm water

16   containing levels of pollutants that adversely impact human health and/or the environment from the

17   Facility occur each time storm water discharges from the Facility.

18       147.    CSPA is informed and believes, and thereon alleges, that storm water containing

19   levels of pollutants that cause or contribute to exceedances of water quality standards has

20   discharged and continues to discharge from the Facility each time storm water discharges from the

21   Facility.

22       148.    The Owners/Operators violate and will continue to violate the Storm Water Permit's

23   Receiving Water Limitations each and every time storm water containing levels of pollutants that

24   adversely impact human health and/or the environment, and that cause or contribute to exceedances

25   of WQS, discharges from the Facility.

26       149.    CSPA is informed and believes, and thereon alleges, that the Owners'/Operators'

27   violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and

28   continuous.

150.     Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

151.     By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 16, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

152.     An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

153.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## THIRD CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Storm Water Pollutant Prevention Plan in Violation of the
Storm Water Permit and the Clean Water Act.
33  U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

154.     CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

155.     CSPA is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

156.     CSPA is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement a SWPPP for the Facility, in violation of the Storm Water Permit.

157.     CSPA is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

158.    The Owners/Operators have been in violation of the Storm Water Permit at the Facility every day from October 16, 2015 to the present.

159.    The Owners'/Operators' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

160.    The Owners/Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Owners/Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

161.    Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

162.    By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 16, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

163.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

164.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FOURTH CAUSE OF ACTION

**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Monitoring and Reporting Plan in Violation of
the Storm Water Permit and the Clean Water Act.
U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

165.    CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

166.    CSPA is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm

Water Permit.

167.    CSPA is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement an MIP for the Facility, in violation of the Storm Water Permit.

168.    CSPA is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately revise an MIP for the Facility, in violation of the Storm Water Permit.

169.    The Owners/Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from October 16, 2015 to the present.

170.    The Owners'/Operators' violations of its Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

171.    The Owners/Operators will continue to be in violation of Section XI of the Storm Water Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an MIP for the Facility.

172.    Each and every violation of the Storm Water Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

173.    By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 16, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

174.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

175.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**FIFTH CAUSE OF ACTION**
**Defendant's Failure to Report as Required by the Storm Water**
**Permit in Violation of the Storm Water Permit and the**
**Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

176.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

177.    CSPA is informed and believes, and thereon alleges, that the Facility Owners/Operators have failed and continue to fail to sufficiently sample and analyze storm water in any reporting year at issue in this Complaint.

178.    CSPA is informed and believes, and thereon alleges, that the Facility Owners/Operators have failed and continue to fail to submit accurate Annual Reports to the Regional Board, in violation of Sections XI and XVI of the Storm Water Permit.

179.    CSPA is informed and believes, and thereon alleges, that the Facility Owners/Operators failed and continue to fail to submit sufficient ERA Reports to the Regional Board for the Facility, despite repeat storm water sample analysis requiring BMP upgrades at the Facility, in violation of Section XII(C) of the Storm Water Permit.

180.    CSPA is informed and believes, and thereon alleges, that the Facility Owners'/Operators' Annual Reports failed and continue to fail to meet the monitoring and reporting requirements of the Storm Water Permit, in violation of Sections XI and XVI of the Storm Water Permit.

181.    CSPA is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have failed and continue to fail to submit complete Annual Reports to the Regional Board, in violation of Sections XI and XVI of the Storm Water Permit.

182.    The Facility Owners/Operators have been in violation of Sections XI, XII and XVI of the Storm Water Permit since at least October 16, 2015.

183.    The Facility Owners/Operators have been in violation of the reporting requirements of the Storm Water Permit each day it has operated the Facility without reporting as required by Receiving Water Limitations and Sections XI, XII(C) and XVI of the Storm Water Permit.

184.    The Owners/Operators have been in violation of Sections XI, XII(C) and XVI of the Storm Water Permit since at least October 16, 2015.

185.    The Owners'/Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

186.    By committing the acts and omissions alleged above, the Owners/Operators of the Facility are subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 16, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

187.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

188.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.    **RELIEF REQUESTED**

189.    Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.    A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA.

b.    A Court order enjoining Defendant from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.    A Court order assessing civil monetary penalties for each violation of the CWA occurring prior to November 2, 2015 at $37,500 per day per violation, as permitted by 33

1  U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4

2  (2009);

3          d.      A Court order assessing civil monetary penalties for each violation of the

4  CWA occurring on or after November 2, 2015 of $55,800 per day, as permitted by 33 U.S.C. §

5  1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2016);

6          e.      A Court order awarding Plaintiff its reasonable costs of suit, including

7  attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water

8  Act, 33 U.S.C. § 1365(d); and

9          f.      Any other relief as this Court may deem appropriate.

10

11  DATED: May 17, 2021

12

13

14                                                  Anthony M. Barnes
                                                    AQUA TERRA AERIS LAW GROUP
15                                                  Attorneys for Plaintiff
                                                    California Sportfishing Protection
16                                                  Alliance

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES